1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**SOUTHERN DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| ESTATE OF DOMINIQUE TURNER; NICKOLAS HUTCHINS, an individual; JAMES MCGEHEE, JR., an individual and minor, by and through his guardian ad litem; and MELISSA REINE, an individual and minor, by and through her guardian ad litem, | CASE NO. 06-CV-02471-H (JMA) ORDER DENYING MOTION TO STRIKE |

11
12
13
14
15

Plaintiffs,

16

vs.

17

COUNTY OF SAN DIEGO; K DIXON, an individual; and DOES 1-50 inclusive,

18
19

Defendants.

20
21

On May 30, 2007, plaintiffs Estate of Dominique Turner (the "Estate"), Nickolas

22

Hutchins, James McGehee, Jr., a minor, by and through his guardian ad litem James

23

McGehee Sr., and Melissa Reine, a minor, by and through her guardian ad litem

24

Francoise Claessens (collectively "Plaintiffs") filed a first amended complaint ("FAC")

25

against defendants County of San Diego ("County"), Dr. Katherine Dixon and Does 1-

26

50 (collectively "Defendants"). (Doc. No. 26.) On June 14, 2007, Dixon filed a motion

27

to strike Plaintiffs' prayer for punitive damages regarding certain claims against her

28

pursuant to Federal Rule of Civil Procedure 12(f). (Doc. No. 29.) On July 23, 2007,

1 Plaintiffs filed an opposition to Dixon's motion to strike.  (Doc. No. 37.)

2       The Court exercises its discretion to decide this motion on the papers pursuant

3 to Civil Local Rule 7.1(d)(1).  For the following reasons, the Court **DENIES** Dixon's

4 motion to strike Plaintiffs' prayer for punitive damages based on Plaintiffs' § 1983

5 claims for deprivation of the right to familial association and for deliberate indifference

6 against Dixon, **WITHOUT PREJUDICE** regarding Dixon's right to raise a similar

7 claim regarding Plaintiffs' deliberate indifference claim on a motion for summary

8 judgment.

9 **Background**

10       According to the FAC, on or about December 23, 2005, Dominique Turner was

11 arrested and booked into the Las Colinas Women's Detention Facility in Santee,

12 California after having been arrested for a public offense.  (FAC ¶ 12.)  As part of the

13 booking process, Turner was asked a series of medical questions by a registered nurse

14 in order to determine if Turner was fit for booking and if she had any medical needs.

15 (Id. ¶ 13.)  Turner denied that she used "street drugs," but stated that she drank at least

16 a fifth of vodka a day, including on that very afternoon, and that she suffered from

17 withdrawal symptoms when she stopped drinking.  (Id. ¶ 14.)

18       According to the FAC, however, Turner was not an alcoholic but rather was

19 addicted to the use of heroin.  (Id.)  Plaintiffs allege that Turner's addiction to heroin

20 would be obvious to any trained medical person given the visible scarring on her arms

21 consistent with intravenous drug use and other symptoms she exhibited.  (Id.)

22       On December 24, 2005, Turner suffered a self inflicted wound to her left hand

23 necessitating her placement in a safety cell. (Id. ¶ 15.)  On December 27, 2005, as part

24 of a treatment plan, Turner was prescribed a series of drugs commonly referred to as

25 benzodiazepines.  (Id. ¶ 16.)  Turner was also ordered by County employee Earl

26 Goldstein to be housed in a sobering cell as needed.  (Id.)

27       On December 29, 2005, at approximately 6:20 p.m., Turner was taken to the Las

28 Colinas medical clinic after she was reported to have ingested bathroom cleaner.  (Id.

¶ 17.)  When questioned about the reason for doing so, Turner responded on several different occasions "I have nothing to live for." (Id.)  Turner was placed in a safety cell, and a few hours later sent to the emergency room at the University of California San Diego ("UCSD") after complaining of abdominal pain.  (Id.)

While Turner was treated at UCSD, a blood toxicology screen came back positive for opiates and benzodiazepines.  (Id. ¶ 18.)  Turner was diagnosed as suffering from combined drug dependency and an antisocial personality disorder, as well as (1) caustic ingestion; (2) suicidal ideation; (3) depression; and (4) opioid abuse. (Id.)  A physician from UCSD instructed that Turner be "evaluated at jail for suicidal ideation."  (Id.)

Upon Turner's return from the UCSD hospital emergency room on December 30, 2005, she was placed in a safety cell and evaluated by Dr. Dixon.  (Id. ¶ 19.)  Dixon's analysis was that Turner had extensive antisocial behaviors while in jail, and that although Turner was superficially cooperative, she was evasive and clearly misleading with her responses.  (Id. ¶ 19.)  Dixon noted that Turner stated that she last used drugs years before even though the available evidence indicated Turner used crystal methamphetamine and heroin within the last year, and that when asked about her ingestion behaviors, Dixon stated that she had no intent or preliminary planing with her behaviors, but when pressed stated that she wanted to hurt herself at the time of the ingestion.  (Id.)  Dixon also noted that Turner, while acknowledging ongoing depression, denied previous self-injury attempts in spite of the jail's records that indicated that she made an apparent manipulative hanging gesture the previous year. (Id.)  Dixon stated that Turner denied a current plan or intent for further self harm and that she acknowledged the futility of such behaviors resulting in her release from jail. (Id.)  Dixon diagnosed Turner with substance abuse (alcohol, heroin, methamphetamine) and an anti-social personality disorder, cleared Turner to go to the housing unit, ordered psychological follow up in one week, and advised Turner of the community mental health resources in her community.  (Id.)

According to the official autopsy report, upon her arrival at her cell door, Turner

attempted to run from the sheriff's deputies, who physically forced her to the floor and "slid" her into the cell. (Id. ¶ 20.) She was housed in administrative segregation because she was combative with deputies and an escape risk. (Id.) She was last seen alive at 6:49 p.m. (Id.) At 7:07 p.m., sheriff's deputies found Turner in her cell hanged by the neck with a sheet tied to a ventilation duct. (Id. ¶ 21.) Turner was pronounced dead at 7:35 p.m. (Id.)

On May 30, 2007, Plaintiffs filed a FAC in the instant suit, alleging claims by Hutchins, McGehee, and Reine for deprivation of the constitutional right to familial association pursuant to 42 U.S.C. § 1983 against Dr. Dixon and Does 1-50 (first claim), by the Estate for deliberate indifference in violation of the Fourteenth Amendment pursuant to 42 U.S.C. § 1983 against Dr. Dixon and Does 1-50 (second claim), and five other claims. (FAC ¶¶ 1-57.) Plaintiffs' prayer for relief includes a request for punitive damages in association with their first two claims. (Id. ¶¶ 27, 33; id. at 11:25-26.) On June 14, 2007, Dixon filed a motion to strike Plaintiffs' prayer for punitive damages regarding Plaintiffs' first two claims against Dixon.

## Discussion

### I.    Legal Standards for Motion to Strike

Before responding to a pleading, a party may move to strike any "redundant, immaterial, impertinent or scandalous matter." See Fed. R. Civ. Proc. 12(f). The Ninth Circuit has provided the following guidance regarding motions to strike:

> "[T]he function of a 12(f) motion to strike is to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial. . . ." "'Immaterial' matter is that which has no essential or important relationship to the claim for relief or the defenses being pleaded." "'Impertinent' matter consists of statements that do not pertain, and are not necessary, to the issues in question."

Fantasy, Inc. v. Fogerty, 984 F.2d 1524, 1527 (9th Cir. 1993), rev'd on other grounds in Fogerty v. Fantasy, Inc., 510 U.S. 517, 534–535 (1994). A motion to strike may be

used to strike a prayer for relief where the damages sought are not recoverable as a matter of law.  See Tapley v. Lockwood Green Engineers, Inc., 502 F.2d 559, 560 (8th Cir. 1974); Arcilla v. Adidas Promotional Retail Operations, Inc., 488 F. Supp. 2d 965, 968 (C.D. Cal. 2007);  see also William W. Schwarzer, et al., California Practice Guide: Federal Civil Procedure Before Trial ¶ 9:389 p. 9-111 (2006).  In determining a motion to strike, a district court must view the pleadings in the light most favorable to the pleader.  See Taylor v. Quall, 471 F. Supp. 2d 1053, 1059 (C.D. Cal. 2007); Lazar v. Trans Union LLC, 195 F.R.D. 665, 669 (C.D. Cal.2000); see also Schwarzer, et al., surpra, at ¶ 9:406, p. 9-114.

## II.     Familial Association Claim

Constitutional rights which are personal rights may not be vicariously asserted, and therefore may generally only be vindicated through a § 1983 suit by the person whose rights were violated.  See Moreland v. Las Vegas Metropolitan Police Dept., 159 F.3d 365, 369 (9th Cir. 1998) (discussing § 1983 suit pursuant to alleged Fourth Amendment violation); but see Smith v. City of Fontana, 818 F.2d 1411 (decedent's estate could assert § 1983 claim on his behalf for violation of Fourth Amendment right) overruled on other grounds by Hodgers-Durgin v. de la Vina, 199 F.3d 1037, 1040 n.1 (9th Cir.1999) (en banc).  Therefore, children of a decedent suing in their individual capacities may not bring a § 1983 suit on the theory that their parent's Fourth Amendment rights have been violated.  See Smith, 818 F.2d at 1417.  Children do have a personal, substantive due process right of familial association with their parents that protects them from unwarranted state interference with that relationship, however, which may be vindicated through a § 1983 suit by the children.  See id. at 1417-20.  This right is subject to the general rule that punitive damages are available in a § 1983 action when a defendant's conduct is shown to be motivated by an evil motive or intent, or when it involves a reckless or callous indifference to the federally protected rights of other persons.  Cf. Mitchell v. Dupnik, 75 F.3d 517, 527 (9th Cir. 1996).

Dixon argues that Hutchins, McGehee, and Reine may not recover punitive

1   damages against Dixon on their § 1983 claim for violation of their right to association

2   with their mother because the paragraph of the FAC in which they allege that they are

3   entitled to punitive damages states that Dixon acted maliciously and with reckless and

4   callous disregard of Turner's rights.   Therefore, according to Dixon, Hutchins,

5   McGehee, and Reine are not seeking to vindicate their personal rights, but rather the

6   rights of their deceased mother. The Court declines to read the allegations of Plaintiff's

7   complaint so narrowly, but rather concludes that viewing the FAC in the light most

8   favorable to Plaintiffs, the FAC alleges that Dixon acted with malice and reckless

9   disregard to Hutchins', McGehee's, and Reine's rights to association with their mother.[1]

10   Accordingly, the Court denies Dixon's motion to strike Hutchins,  McGehee, and

11   Reine's prayer for punitive damages based on their alleged failure to assert a claim

12   based on their personal constitutional rights.

13   **III.    Deliberate Indifference Claim**

14          With regard to the medical needs of pretrial detainees, the Due Process Clause

15   of the Fourteenth Amendment imposes, at a minimum, the same duty the Eighth

16   Amendment imposes regarding prisoners, that is, the right to not have officials remain

17   deliberately indifferent to their serious medical needs.  See Gibson v. County of

18   Washoe, Nev., 290 F.3d 1175, 1187 (9th Cir. 2002).  The duty imposed by the Due

19   Process Clause to provide medical care encompasses a detainee's psychiatric needs.

20   See id.  "In order to comply with their duty not to engage in acts evidencing deliberate

21   indifference to inmates' medical and psychiatric needs, jails must provide medical staff

22   who are 'competent to deal with prisoners' problems.'" Id.  Violation of a detainee's

23   right to not have an official act with deliberate indifference to her medical needs can

24   constitute the basis of a § 1983 claim.  See id. at 1194.

25          Under the deliberate indifference test, a person is liable for denying a detainee

---

27   [1] Alternatively, Plaintiffs request the Court allow them, if necessary, to amend the
   allegations of their FAC to state that Dixon acted maliciously and with reckless and
28   callous disregard for Turner's rights and Hutchins', McGehee's, and Reine's rights to
   familial association.  If the Court had not concluded that such an amendment was
   unnecessary, the Court would have granted Plaintiffs' request.  See Fed. R. Civ. Proc.
   15(a) (leave to amend "shall be freely given when justice so requires").

1    needed medical care if the person knows of and disregards an excessive risk to the

2    detainee's health and safety.  See id.  The Ninth Circuit has recently explained that the

3    test for deliberate indifference consists of two parts:

> First, the plaintiff must show a "serious medical need" by demonstrating
> that "failure to treat a prisoner's condition could result in further
> significant injury or the 'unnecessary and wanton infliction of pain.'"
> Second, the plaintiff must show the defendant's response to the need was
> deliberately indifferent.  This second prong--defendant's response to the
> need was deliberately indifferent--is satisfied by showing (a) a purposeful
> act or failure to respond to a prisoner's pain or possible medical need and
> (b) harm caused by the indifference.  Indifference "may appear when
> prison officials deny, delay or intentionally interfere with medical
> treatment, or it may be shown by the way in which prison physicians
> provide medical care."

15   Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006)(internal citations omitted).  While

16   poor medical treatment will at a certain point rise to the level of constitutional violation,

17   mere malpractice, or even gross negligence, does not satisfy the requirement of

18   deliberate indifference.  See Wood v. Housewright, 900 F.2d 1332, 1334 (9th Cir.

19   1990); see also Farmer v. Brennan, 511 U.S. 825, 835 (1994) ("[D]eliberate

20   indifference entails something more than mere negligence. . . [but] is satisfied by

21   something less than acts or omissions for the very purpose of causing harm or with

22   knowledge that harm will result.").

23        Dixon argues that Plaintiffs' allegations demonstrate on their face that Dixon did

24   not violate the second prong of the deliberate indifference test.  Therefore, according

25   to Dixon, since there is a serious question as to whether Plaintiffs can show deliberate

26   indifference, they can not show an entitlement to punitive damages.

27        The Court notes that although it is a close question whether the facts alleged by

28   Plaintiffs regarding Dixon's treatment of Turner could constitute more than gross

negligence, but rather deliberate indifference, Dixon has not brought a motion to dismiss or a motion for judgment on the pleadings, but only a motion to strike the prayer for punitive damages.  The Court concludes, therefore, that determining whether Dixon was deliberately indifferent is better suited for summary judgment.

Moreover, Federal Rule of Civil Procedure 8(a)(2) requires only that a plaintiff's complaint include "a short and plain statement of the claim showing that the pleader is entitled to relief," while Rule 9(b) provides that, even in association with allegations of fraud, "[m]alice, intent, knowledge, and other conditions of mind of a person may be averred generally."  Thus, in federal court, a plaintiff may adequately allege punitive damages through a short and plain prayer that relies entirely on unsupported and conclusory averments.  See Clark v. State Farm Mut. Auto. Ins. Co., 231 F.R.D. 405, 406 (C.D. Cal. 2005); Clark v. Allstate Ins. Co., 106 F. Supp. 2d 1016, 1019 (S.D. Cal. 2000).  Therefore, the Court concludes that viewing Plaintiffs' allegations in the light most favorable to them, including Plaintiffs' allegation that Dixon acted maliciously and with reckless and callous disregard for Turner's rights, Plaintiffs have alleged sufficient facts to survive Dixon's motion to strike Plaintiffs' prayer for punitive damages regarding their § 1983 claim based on Dixon's alleged deliberate indifference.  Accordingly, the Court denies Dixon's motion to strike Plaintiffs' prayer for punitive damages associated with Plaintiffs' § 1983 claim based on Dixon's alleged deliberate indifference, without prejudice regarding Dixon's right to raise a similar claim on a motion for summary judgment.

## **Conclusion**

For the reasons discussed, the Court **DENIES** Dixon's motion to strike Plaintiffs' prayer for punitive damages based on Plaintiffs' § 1983 claims for deprivation of the right to familial association and for deliberate indifference against Dixon, **WITHOUT**

/ / /

/ / /

/ / /

1    **PREJUDICE** regarding Dixon's right to raise a similar claim regarding Plaintiffs'

2    deliberate indifference claim on a motion for summary judgment.

3         IT IS SO ORDERED.

4    DATED:  August 1, 2007

5    _____
     MARILYN L. HUFF, District Judge
6    UNITED STATES DISTRICT COURT

7

8

9

10

11

12

13

14

15

16

17

18

19   COPIES TO:
     All parties of record.
20

21

22

23

24

25

26

27

28

- 9 -                                      06cv2471